UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | | |
|---|---|---|---|
| STEPHEN B. WLODARZ, | ) | | |
| | ) | | |
| Plaintiff, | ) | | |
| | ) | | |
| v. | ) | No.: | 3:20-CV-199-RLJ-DCP |
| | ) | | |
| CENTURION OF TENNESSEE, LLC, et al., | ) | | |
| | ) | | |
| | ) | | |
| Defendants. | ) | | |

## MEMORANDUM OPINION

Defendants Lynndy Byrge and Centurion of Tennessee, LLC ("Centurion") have filed separate motions for summary judgment in this pro se prisoner's civil rights action under 42 U.S.C. § 1983 [Docs. 152 and 155], and Defendant Kenneth Williams has filed a motion to dismiss all claims against him [Doc. 159]. Plaintiff has filed responses in opposition to the motions [Docs. 180, 182, 83], along with a declaration and supporting exhibits [Doc. 184], and Defendants Byrge and Centurion have filed replies to Plaintiff's responses [Docs. 185 and 186]. Upon consideration of the parties' pleadings, the competent summary judgment evidence, and the applicable law, the Court finds that summary judgment should be **GRANTED** in favor of Defendants Byrge and Centurion. Defendant Williams' motion to dismiss will also be **GRANTED**, and this action will be fully and finally **DISMISSED**.

## I.    BACKGROUND

On June 25, 2015, Plaintiff, an inmate in the custody of the Tennessee Department of Correction ("TDOC"), was transferred from Northeast Correctional Complex ("NECX") to DeBerry Special Needs Facility ("DSNF") due to a suspected infection of his left hip [Doc. 154-1 ¶ 8; Doc. 158 p. 36]. The same day, an MRI of Plaintiff's left hip was conducted and showed a

small abscess of the iliac muscle[1], and findings consistent with osteomyelitis[2] and myositis[3] [Doc. 154-1 ¶ 8; Doc. 158 p. 36].  Blood cultures were taken, and Plaintiff was started on IV antibiotics [Doc. 154-1 ¶ 8; Doc. 158 p. 36].  Plaintiff was then evaluated by orthopedic surgeons at Centennial Medical Center in Nashville, Tennessee [Doc. 154-1 ¶ 8; Doc. 158 p. 36].

On June 26, 2015, Plaintiff underwent "a left hip girdlestone femoral head resection,"[4] which was performed by Dr. Lucas Burton [Doc. 154-1 ¶ 9; Doc. 158 p. 36].  Plaintiff was clinically stable following this procedure [Doc. 154-1 ¶ 9, Doc. 158 p. 36].  Plaintiff was discharged back to DSNF on June 29, 2015, for further management [Doc. 154-1¶ 10; Doc. 158 p. 36].

At DSNF, the Plaintiff was provided a walker for ambulatory assistance and wound care was provided for his left hip incisional wound [Doc. 154-1 ¶ 11; Doc. 158 p. 36].  In addition, he completed several weeks of IV antibiotic treatment [Doc. 154-1 ¶ 11; Doc. 158 p. 36].  While Plaintiff was at DSNF, several orthopedic surgery follow-up consults were requested on his behalf, as was an infectious disease consult [Doc. 154-1 ¶ 11; Doc. 158 p. 36].

---

[1] "The iliacus muscle is the triangle-shaped muscle in your pelvic bone that flexes and rotates your thigh bone."  *See* verywellhealth, "*The Anatomy of the Iliacus Muscle*," https://www.verywellhealth.com/iliacus-muscle-5084420 (last accessed Jan. 12, 2023).

[2] "Osteomyelitis is an infection in a bone."  Mayo Clinic, "*Osteomyelitis*," https://www.mayoclinic.org/diseases-conditions/osteomyelitis/symptoms-causes/syc-20375913 (last accessed Jan. 12, 2023).

[3] "Myositis is a disease that makes your immune system attack your muscles.  It causes chronic inflammation[.]"  Cleveland Clinic, "*Myositis*," https://my.clevelandclinic.org/health/diseases/24170-myositis (last accessed Jan. 12, 2013).

[4] Broadly defined, a girdlestone resection "is removal of the head and neck of the femur without replacing anything that fills the gap[.]"  National Library of Medicine, "*The Girdlestone Situation: A Historical Essay*," https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6831807/#:~:text=Currently%20the%20broad% 20definition%20of%20a%20Girdlestone%20resection,attributed%20different%20procedures%2 0when%20we%20refer%20to%20him (last accessed Jan. 13, 2023).

On January 15, 2016, Plaintiff was discharged to another unit in DSNF in clinically stable condition with the ability to ambulate using his walker [Doc. 154-1 ¶ 12; Doc. 158 p. 36]. His discharge diagnoses were "[s]tatus post-left hip and femoral head resection, secondary to septic arthritis and chronic osteomyelitis" [Doc. 154-1 ¶12; Doc. 158 p. 36].

On January 28, 2016, Plaintiff was evaluated at the DSNF orthopedic clinic with no complaints noted [Doc. 154-1 ¶ 13; Doc. 158 p. 40].

On March 17, 2016, Plaintiff saw Dr. Ronald Baker, at DSNF [Doc. 154-1 ¶ 14; Doc. 158 p. 41]. Dr. Baker documented that Plaintiff had a history of severe right hip pain due to failed prior surgery [Doc. 154-1 ¶ 14; Doc. 158 p. 41]. He recommended that Plaintiff follow-up with someone who specialized in complex hip revision surgery [Doc. 154-1 ¶ 14; Doc. 158 p. 41].

On April 15, 2016, Plaintiff was discharged from DSNF and transferred to Morgan County Correctional Complex ("MCCX") with a medical progress record notation that referrals were indicated for labs and the medical provider [Doc. 154-1 ¶ 15; Doc. 158 p. 32].

On April 18, 2016, an MCCX Consult Coordinator documented that Plaintiff had pending orthopedic consults but was unable to find the reports from the June and July 2015 appointments and planned to follow up with the report request [Doc. 154-1 ¶ 16; Doc. 158 p. 32].

On April 25, 2016, Dr. Paul Niner evaluated Plaintiff in the Chronic Disease Clinic [Doc. 154-1 ¶ 17; Doc. 158 p. 7]. Dr. Niner documented that Plaintiff had osteomyelitis in his left hip and ordered laboratory work [Doc. 154-1 ¶ 17; Doc. 158 p. 7]. Later the same day, Dr. Niner submitted a Non-Formulary Medication Tracking Form for Plaintiff to receive 1,000 mg of Vitamin C, once a day, for 120 days [Doc. 154-1 ¶ 18; Doc. 158 p. 21-22]. Dr. Niner documented

that the request was lodged because Plaintiff had been in prison for fifteen years with progressive symptoms consistent with Vitamin C deficiency.[5] [Doc. 158 p. 22]

On May 5, 2016, Dr. Niner placed an order for arch support for orthopedics for Plaintiff [Doc. 154-1 ¶ 19; Doc. 158 p. 21].

On May 16, 2016, Dr. Edmund Lane[6] ordered an x-ray of Plaintiff's left hip and an orthopedic consult with potential orthopedic surgery at the Centennial Medical Center [Doc. 154-1 ¶ 20; Doc. 158 p. 20]. Additionally, Dr. Lane prescribed Plaintiff a wheelchair for 90 days and instructed him to follow up in the Chronic Care Clinic in 90 days [Doc. 154-1 ¶ 20; Doc. 158 p. 20].

Plaintiff's x-rays showed findings that Plaintiff had an absent left femoral head and "[d]egenerative spurring at the acetabulum," with recommendations for "[c]linical correlation and comparison with previous studies" [Doc. 154-1 ¶ 21; Doc. 158 p. 10].

The following day, May 17, 2016, Dr. Lane submitted a Prior Authorization Form requesting that Plaintiff receive a left hip replacement due to his history of septic arthritis and the prior girdlestone procedure he underwent on June 26, 2015 [Doc. 154-1 ¶ 22; Doc. 158 p. 37]. Dr. Lane requested that the surgery be performed at the Centennial Medical Center by Dr. Lucas Burton [Doc. 158 p. 37]. The request was approved by Dr. Turney, and Plaintiff was scheduled a follow-up appointment with Dr. Dube at Saint Thomas Medical Partners on October 16, 2017 [*Id.*].

On August 1, 2016, Dr. Niner evaluated Plaintiff in the Chronic Disease Clinic and noted that an orthopedic specialty consult was pending for Plaintiff [Doc. 154-1 ¶ 23; Doc. 158 p. 6].

---

[5] Defendant Byrge interprets this handwritten note to indicate that this request "was due to the pressure symptoms over 15 years while in prison with Vitamin C deficiency" [Doc. 154-1 ¶ 18].

[6] Dr. Lane was initially named as a Defendant but his motion to dismiss was granted [*See* Docs. 58 and 59].

4

Dr. Niner evaluated Plaintiff again on September 8, 2016, and the only abnormality noted was that Plaintiff was missing his left hip joint [Doc. 154-1 ¶ 24; Doc. 158 p. 8]. On October 27, 2016, Dr. Niner evaluated Plaintiff in the clinic and documented that Plaintiff presented with "no new issues" [Doc. 154-1 ¶ 25; Doc. 158 p. 5].

Less than a month later, on November 21, 2016, Plaintiff was prescribed Ibuprofen 200 mg to be taken three times per day for three days [Doc. 154-1 ¶ 26; Doc. 158 p. 19].

On January 10, 2017, Dr. Lane entered orders for an orthopedic consult for Plaintiff's left hip replacement, as well as orders for Ultram 50 mg, one tablet twice per day for 30 days to address Plaintiff's reported pain from the osteomyelitis [Doc. 154-1 ¶ 27; Doc. 158 p. 19].

On January 20, 2017, Dr. Lane evaluated Plaintiff in the Chronic Disease Clinic and continued the orders already in place [Doc. 154-1 ¶ 28; Doc. 158 p. 3, 19]. Additionally, he placed orders that Plaintiff could use his wheelchair for an additional 90 days and that Plaintiff would return to the Chronic Care Clinic in 90 days [Doc. 154-1 ¶ 28; Doc. 158 p. 19].

On February 6, 2017, Dr. Lane documented that Plaintiff's orthopedic consult was pending and the Plaintiff was awaiting the assignment of a joint specialist to evaluate him [Doc. 154-1 ¶ 29; Doc. 158 p. 31].

On April 5, 2017, Dr. Lane evaluated Plaintiff in the Chronic Disease Clinic and documented Plaintiff's osteomyelitis and that the consult for a hip replacement was pending [Doc. 154-1 ¶ 30; Doc. 158 p. 2]. Dr. Lane placed orders for wheelchair for Plaintiff for an additional 90 days, Ultram 50 mg by mouth twice daily for six months, and for Plaintiff to follow up in the Chronic Care Clinic in six months for the osteomyelitis in his left hip [Doc. 154-1 ¶ 30; Doc. 158 p. 18].

5

On April 22, 2017, Kara Hall, RN, made a physician referral due to Plaintiff's noncompliance with his Ultram [Doc. 154-1 ¶ 31; Doc. 158 p. 30].

On June 5, 2017, Dr. Lane entered orders for Plaintiff's Ultram (Tramadol) prescription to be discontinued for noncompliance [Doc. 154-1 ¶ 32; Doc. 158 p. 18].

On July 3, 2017, Dr. Lane evaluated Plaintiff and ordered Plaintiff to receive a wheelchair for an additional 90 days, fish oil 1,000 mg for joint pain for six months, and for a check to be conducted on the status of Plaintiff's orthopedic surgery consult previously approved by Dr. Turney in June 2016 [Doc. 154-1 ¶ 33; Doc. 158 p. 17].

Two months later, on September 7, 2017, Dr. Lane evaluated Plaintiff and ordered an x-ray of his pelvis due to Plaintiff's history of previous abscesses [Doc. 154-1 ¶ 35; Doc. 158 p. 17]. The x-ray was performed the same day and demonstrated that there was a chronic fracture of Plaintiff's left femoral head and neck with cephalad dislocation of the left femur [Doc. 154-1 ¶ 35; Doc. 158 p. 9].

On October 9, 2017, Dr. Lane once again saw Plaintiff in the Chronic Care Clinic and diagnosed him with osteomyelitis [Doc. 154-1 ¶ 36; Doc. 158 p. 16].  In addition, Dr. Lane continued Plaintiff's wheelchair prescription for an additional 90 days and ordered that Plaintiff follow up in the Chronic Care Clinic in six months for his osteomyelitis [Doc. 154-1 ¶ 36; Doc. 158 p. 16].

 Plaintiff was transported to DSNF on October 13, 2017, for evaluation by orthopedic providers [Doc. 154-1 ¶ 37; Doc. 158 p. 29].  While at DSNF, Plaintiff stated that he fell on October 17, 2017, and was subsequently evaluated by a nurse practitioner who noted in a progress record that Plaintiff was "unable to see ortho at app[ointment]t" [Doc. 158 p. 28-29].  On October 20, 2017, DSNF providers documented that MCCX was to reschedule the orthopedic appointment

because the orthopedic provider Plaintiff was scheduled with was no longer in the network [Doc. 154-1 ¶ 39; Doc. 158 p. 28].

On October 17, 2017, Plaintiff filed his first grievance about his medical care [*See* Doc. 1-2 p. 1-4]. The grievance regarded the alleged failure of TDOC transport officers to take him to the proper destination of his medical appointment the previous day [*Id*.].

On December 17, 2017, Dr. Lane submitted a Non-Formulary Medication Tracking Form for Plaintiff to receive Omega III fish oil 1,000 mg twice per day with the notation that the drug was necessary due to the "difficulty finding a hip specialist" to treat Plaintiff [Doc. 154-1 ¶ 41; Doc. 158 p. 15].

On March 28, 2018, Plaintiff was evaluated by Dr. Lane, who ordered Plaintiff to be evaluated in the Chronic Care Clinic in six months, to check on the pending ortho consult for Plaintiff's left hip replacement, and to renew Plaintiff's wheelchair for an additional 90 days [Doc. 158 p. 14]. Plaintiff was again evaluated in the Chronic Care Clinic on September 5, 2018, where Dr. Lane entered orders for Plaintiff to be evaluated again in 180 days, with the notation that he and Plaintiff discussed an alternate treatment plan for hip replacement [Doc. 158 p. 26].

Plaintiff was evaluated by Dr. Higgs on November 2, 2018, who noted Plaintiff's orthopedic issues and determined Plaintiff had a "fair prognosis" [Doc. 158 p. 25].

On November 6, 2018, Dr. Lane submitted a Prior Authorization Form requesting a left hip replacement for Plaintiff due to his recurrent left hip osteomyelitis and, as a showing of medical necessity, provided the results of the MRI left hip on June 29, 2015, and the x-rays taken on September 7, 2017 [Doc 154-1 ¶ 46; Doc. 158 p. 35]. The consult was approved, and an appointment was scheduled for Plaintiff to be evaluated at Appalachian Orthopedic Associates on January 8, 2019 [Doc. 158 p. 35].

On January 8, 2019, Plaintiff was transported from MCCX to Appalachian Orthopedic Associates, where he was evaluated by Dr. Jason Brashear [Doc. 154-1 ¶ 47; Doc. 158 p. 34]. Dr. Brashear diagnosed Plaintiff with "left hip girdlestone status post aseptic arthritis" [Doc. 154-1 ¶ 47; Doc. 158 p. 39]. Dr. Brashear extensively reviewed his findings with Plaintiff and explained his treatment options [*Id.*]. Specifically, Dr. Brashear explained that he did not feel that he could "get an overall good outcome" for Plaintiff and "discussed the complications and risks with this surgery," to which Plaintiff voiced his understanding [*Id.*]. Dr. Brashear recommended that Plaintiff be evaluated by someone who performs "more complex joint reconstruction" and discussed the surgical risks with Plaintiff [*Id.*].

Days later, on January 17, 2019, Dr. Lane submitted a Prior Authorization Form requesting that Vanderbilt University Medical Center perform a complete joint reconstruction of Plaintiff's left hip [Doc. 154-1 ¶ 48; Doc. 158 p. 33].

On January 29, 2019, Plaintiff submitted a grievance alleging deliberate indifference to his medical needs and "negligence in scheduling" [Doc. 154-1 ¶ 60; Doc. 15-1 p. 14]. Plaintiff requested his total hip replacement follow-up surgery that was purportedly prescribed by Dr. Lucas Burton on July 16, 2015 [Doc. 154-1 ¶ 60; Doc. 15-1 p. 15-16].

On January 31, 2019, Heath Service Administrator Lynndy Byrge responded to Plaintiff's grievance after reviewing his recent records [Doc. 154-1 ¶¶ 2, 61; Doc. 15-1 p. 17]. Based on her review of Plaintiff's medical records, she determined that Plaintiff was transported to Appalachian Orthopedic Associates on January 8, 2019, in regard to a consultation written by Dr. Lane on November 16, 2018 [Doc. 154-1 ¶ 61; Doc. 15-1 p. 17]. Per the specialist's plan of care, Dr. Lane initiated a consult on January 17, 2019, for Vanderbilt to evaluate Plaintiff's case [Doc. 154-1 ¶ 61; Doc. 15-1 p. 17]. The consult was pending by the utilization management team at the time

Byrge responded to the grievance [Doc. 154-1 ¶ 61; Doc. 15-1 p. 17]. Ms. Byrge further instructed that they would communicate any updates to that status to Plaintiff when an update was available [Doc. 154-1 ¶ 61; Doc. 15-1 p. 17].

Two weeks later, on February 14, 2019, Dr. Lane examined Plaintiff and documented that Dr. Brashear had opined that a good surgical outcome for Plaintiff without complications could not be expected, and that the revision surgery was an extremely difficult procedure [Doc. 154-1 ¶ 49; Doc. 158 p. 24]. Dr. Lane further documented that Plaintiff was 67 at the time, and the risks of cellulitis, sepsis, cardiac problems, pulmonary arrest, paralysis, and death were all possible if he underwent the surgery [Doc. 154-1 ¶ 49; Doc. 158 p. 24]. Dr. Lane noted that Plaintiff was able to walk with an assistive device, which he had done since 2015 [Doc. 154-1 ¶ 49; Doc. 158 p. 24]. Dr. Lane concluded the note by stating that "benefit from a complex surgery would probably show minimal improvement" [Doc. 154-1 ¶ 49; Doc. 158 p. 24].

On February 19, 2019, Plaintiff filed a grievance asserting that Dr. Lane had not provided him with treatment for "pockets of abscesses" and atrophy in his left hip. Plaintiff requested the "full details" of Dr. Lane's diagnosis, along with a clear and full explanation for the alleged non-treatment of his condition by Dr. Lane and others [Doc. 154-1 ¶ 62; Doc. 15-1 p. 38-40].

Defendant Byrge responded to the grievance on February 26, 2019, after she reviewed Plaintiff's medical chart [Doc. 154-1 ¶ 63; Doc. 15-1 p. 41]. Based on her review of Plaintiff's medical chart and discussing the case with Dr. Lane, Byrge explained in the response that the medical staff had determined the risk factors of the girdlestone procedure outweighed the benefits of positive outcomes of the procedure [Doc. 154-1 ¶ 63; Doc. 15-1 p. 41]. Byrge further explained that the confirmation of risk factors were recently evaluated by Dr. Brashear with Appalachian

Orthopedic Associates and the poor outcome was extensively discussed with Plaintiff [Doc. 154-1 ¶ 63; Doc. 15-1 p. 41].

On March 18, 2019, Dr. Lane evaluated Plaintiff in the Chronic Care Clinic and issued orders to renew Plaintiff's wheelchair prescription for 180 days; Motrin 200 mg, 3 tablets twice daily as needed for joint pain; Eucerin cream to treat Plaintiff's psoriasis; and for Plaintiff to follow up in the Chronic Care Clinic in 180 days [Doc. 154-1 ¶ 50; Doc. 158 p. 38].

On September 12, 2019, Plaintiff refused his Chronic Care Clinic visit [Doc 154-1 ¶ 51; Doc. 158 p. 4].

On March 25, 2020, Dr. Lane evaluated Plaintiff in the Chronic Disease Clinic and diagnosed him with osteomyelitis and psoriasis [Doc. 154-1¶ 53; Doc. 158 p. 23]. The physician entered orders for Plaintiff to return to the Clinic in 180 days for the osteomyelitis hip pain [Doc. 154-1 ¶ 53; Doc. 158 p. 23].

On or about September 21, 2021, a left hip aspiration was performed on Plaintiff to confirm the presence or absence of infection [Doc. 154-1 ¶ 54; *see also* Doc. 104]. On or about October 20, 2021, while still awaiting the results of that procedure, the office of Dr. John Ryan Martin at Vanderbilt Orthopedics was contacted to schedule a follow-up appointment [Doc. 154-1 ¶ 55]. On October 26, 2021, the results of Plaintiff's aspiration returned normal [*Id*. at ¶ 56;]. On or about November 4, 2021, Dr. Martin's office relayed that Plaintiff's surgery was scheduled for January 2022 [*Id*. at ¶ 57]. That surgery date had to be rescheduled due to a snowstorm [*Id*. at ¶ 58].

On April 8, 2022, Plaintiff underwent a left hip revision and was discharged on April 9, 2022, back to DSNF [*Id*. at ¶ 59].

## II.    MOTIONS FOR SUMMARY JUDGMENT

### A.    Summary Judgment Standard

Summary judgment is proper only when the pleadings and evidence "show[] that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is deemed "material" if resolving that fact in favor of one party "might affect the outcome of the suit under governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether a genuine issue of material fact exists, the court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in that party's favor.  *Anderson*, 477 U.S. at 255; *see also Tolan v. Cotton*, 572 U.S. 650, 660 (2014) (noting it is a "fundamental principle that at the summary judgment stage, reasonable inferences should be drawn in favor of the nonmoving party").  Therefore, to be granted summary judgment, the moving party must demonstrate that the nonmoving party cannot establish an essential element of his case for which he bears the ultimate burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Once a summary judgment motion is properly supported with competent evidence, the nonmovant must show that summary judgment is inappropriate by setting forth specific facts showing there is a genuine issue for trial.  *Celotex*, 477 U.S. at 323; *Anderson*, 477 U.S. at 249. That is, "the nonmoving party then must go beyond the pleadings and by affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  *Moore v. Philip Morris Cos., Inc*., 8 F.3d 335, 339 (6th Cir. 1993)) (citation and internal quotation marks omitted).  The "mere existence of a scintilla of evidence in support of the" nonmoving party is not sufficient to avoid summary judgment. *Anderson*, 477 U.S. at 252.  Rather, "there must be evidence on which the jury could reasonably

find for the [nonmovant]." *Id*.

The Court notes that the very purpose of summary judgment is to "pierce the pleadings and assess the proof in order to see whether there is a genuine issue for trial." *See* Advisory Committee Note to the 1963 Amendments to Rule 56. Indeed, "[t]he amendment is not intended to derogate from the solemnity of the pleadings[;] [r]ather, it recognizes that despite the best efforts of counsel to make his pleadings accurate, they may be overwhelmingly contradicted by the proof available to his adversary." *Id.* A nonmovant cannot meet his burden of refuting a properly-supported summary judgment motion with "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986), "conclusory allegations," *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 888 (1990), or by a mere "scintilla" of evidence, *Anderson*, 477 U.S. at 252. It would undermine the purposes of summary judgment if a party could defeat such a motion simply by "replac[ing] conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." *Lujan*, 497 U.S. at 888. Therefore, in considering a motion for summary judgment, a court must determine whether the non-moving party's allegations are *plausible*. *Matsushita,* 475 U.S. at 586. (emphasis added). "[D]etermining whether a complaint states a plausible claim for relief. . . [is] context-specific[,] . . . requir[ing] the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (discussing plausibility of claim as a requirement to survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6)).

### B. Deliberate Indifference

#### 1. Legal Standard

Plaintiff alleges that Defendants demonstrated deliberate indifference to his serious medical needs by failing to timely schedule his prescribed hip surgery [*See, e.g.,* Doc. 15 p. 15]. Plaintiff's allegations are assessed under the Eighth Amendment's prohibition against cruel and

unusual punishment, which proscribes acts or omissions that produce an "unnecessary and wanton infliction of pain." *Wilson v. Seiter*, 501 U.S. 294, 297 (1991). An Eighth Amendment claim for the denial of adequate medical treatment is composed of two parts: (1) an objective component, which requires a plaintiff to show a "sufficiently serious" medical need; and (2) a subjective component, which requires the plaintiff to show the defendants acted with "deliberate indifference" to that need. *Farmer v. Brennan*, 511 U.S. 825, 834, 842 (1994).

When considering the objective component of the deliberate indifference inquiry in a medical care case where some treatment has been rendered, courts are "generally reluctant to second guess medical judgments," and thus, a medial provider's treatment may violate the Constitution only where it "so woefully inadequate as to amount to no treatment at all." *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011) (citing *Westlake v. Lucas*, 537 F.2d 857, 860 n. 5 (6th Cir. 1975)). It is typically the case that "[a] patient's disagreement with his physicians over the proper course of treatment alleges, at most, a medical-malpractice claim, which is not cognizable under § 1983." *Darrah v. Krisher*, 865 F.3d 361, 372 (6th Cir. 2017) (citing *Estelle v. Gamble*, 429 U.S. 97, 107 (1976)).

Therefore, "[o]nly grossly or woefully inadequate care—not just care that falls below a professional standard—can be called 'cruel and unusual' in the objective sense." *Phillips v. Tangilag*, 14 F.4th 524, 535 (6th Cir. 2021) (citations omitted). In such cases, the plaintiff must produce "medical proof that the provided treatment was not an adequate medical treatment of [the inmate's] condition or pain." *Santiago v. Ringle*, 734 F.3d 585, 591 (6th Cir. 2013); *see also Napier v. Madison Cnty., Ky.*, 238 F.3d 739, 742 (6th Cir. 2001) (holding claim based on delay in treatment requires plaintiff to "place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed") (citation omitted).

13

In order to meet the subjective requirement of the Eighth Amendment test, an inmate must show more than negligence in failing to render adequate medical care. *See, e.g., Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008). Rather, deliberate indifference is demonstrated only where "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference.'" *Id*. (quoting *Farmer*, 511 U.S. at 837). The Sixth Circuit has held that "there is a high bar that a plaintiff must clear to prove an Eighth Amendment medical-needs claim: The doctor must have *consciously* expos[ed] the patient to an *excessive* risk of *serious* harm." *Rhinehart v. Scutt*, 894 F.3d 721, 738-39 (6th Cir. 2018) (citation and internal quotation marks omitted).

Also, where a private entity contracts with the state to perform a traditional state function (such as providing medical care at a penal institution), it acts under color of state law and may be sued under 42 U.S.C. § 1983. *See Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). However, a private entity cannot be subject to § 1983 liability merely because it has employed someone who violated Plaintiff's constitutional rights; that is, it "cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978). Rather, to prevail on a § 1983 claim against a contract provider, a plaintiff "must show that a policy or well-settled custom of the company was the 'moving force' behind the alleged deprivation" of his rights. *Braswell v. Corr. Corp. of Am.*, 419 F. App'x 622, 627 (6th Cir. 2011) (citation omitted). Plaintiff must "identify the policy, connect the policy to the [entity] itself and show that the particular injury was incurred because of the execution of that policy." *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993) (citation omitted).

## 2. Analysis

Plaintiff maintains that the delay of over six years between his initial hip procedure and his hip replacement is an issue for the jury, and he attributes the delay to the repeated diagnosis of "osteomyelitis" and pockets of abscesses without treatment, and to Dr. Lane's purported assertion in February 2019 that he would not make further surgical appointments for Plaintiff [Doc. 182 p. 5-6; Doc. 183 p. 2-3]. However, the competent summary judgment evidence does not support Plaintiff's assertions.

The undisputed evidence before the Court is that surgical consults had to be reviewed and approved by Centurion's utilization management team, which review the inmate's medial record alongside recommendations of the treating provider [Doc. 157-1 ¶ 6]. Even where treatment requests are approved, the team must then find an outside practitioner willing to provide treatment to TDOC inmates and schedule such treatment [*Id*.]. That process may be lengthy, particularly in cases – such as Plaintiff's – where a specialist is required [*Id*.]. In Plaintiff's case, the evidence demonstrates that, at all relevant times, "the utilization management team was working on scheduling his orthopedic consult was having difficulty locating a practitioner in that specialty; locating a practitioner that was in network; rescheduling a consult due to the Plaintiff's falling, as well as a myriad of other reasons reflected in his medical chart that were out of the control of the utilization management team" [*Id*. at ¶ 7]. Among the "myriad of other reasons" is the ubiquitous COVID-19 pandemic, which "hindered the ability to make appointments in outside facilities" [*Id*. at ¶ 8].

Plaintiff's medical records demonstrate that in 2016, a specialty orthopedic consult was approved for Plaintiff, and Plaintiff missed that consult scheduled for October 2017 due to a fall

[Doc. 158 p. 27, 37][7].  The records yield that as of December 2017, Plaintiff's treatment providers were seeking non-formulary treatments for Plaintiff due to the difficulty in finding a hip specialist [*Id*. at 15].  Ultimately, Plaintiff's orthopedic appointment was approved and rescheduled with Dr. Brashear, who determined that a good surgical outcome for the Plaintiff without complications could not be expected "in [his] hands" [*Id*. at 35, 39].  In accordance with Dr. Brashear's plan of care, Dr. Lane submitted a consult request for Plaintiff to receive hip revision surgery at Vanderbilt University Medical Center [Doc. 158 p. 33; *see also* Doc. 154-1 ¶ 48].  While that request was pending, informed by Dr. Brashear's findings, Dr. Lane opined in his records of a February 2019 evaluation of Plaintiff that surgery would yield little benefit but post substantial risks for Plaintiff [Doc. 158 p. 24].

It is unclear what events between Dr. Lane's 2019 consult request and Plaintiff's left hip aspiration in 2021 led to Plaintiff's hip revision surgery [*See* Doc. 154-1 ¶¶ 48, 54, and 59; *see also* Docs. 98 and 104].  Specifically, it is unclear whether Plaintiff's April 2022 hip revision surgery at Vanderbilt came about because of the specialty consult request Dr. Lane placed in January 2019, or whether a different set of events led to Plaintiff's surgery.  Regardless, it is without question that prison officials located a specialist who determined that Plaintiff should undergo the hip replacement procedure.  It was approved for the Plaintiff to undergo that procedure, and Plaintiff underwent a left hip revision on April 8, 2022. [Doc. 154-1 ¶¶ 55-59; Doc. 104, 124].

Therefore, the undisputed evidence in this case shows that, since at least 2015, Plaintiff has received extensive medical care relating to his hip, culminating in hip revision surgery in April of 2022.  Between those dates, he underwent diagnostic testing, was referred for specialty consults,

---

[7] A note entered on October 20, 2017 states that MCCX would reschedule the appointment, as the provider was no longer in network [Doc. 158 p. 28].

prescribed pain medication and mobility devices, and routinely evaluated by medical providers [*See* Doc. 15-1 ¶¶ 10-47; Doc. 154-1 ¶¶ 7-59; Doc. 158]. His medical records demonstrate that the only break in his treatment and pain management until his surgery on April 8, 2022, came from the Plaintiff himself when he refused treatment on September 12, 2019, and when he missed two doses of his pain medication, Ultram, in April 2017 [Doc. 15-1 ¶¶ 10-47; Doc. 154-1 ¶¶ 7-59; Doc. 158]. Plaintiff has not pointed to any evidence why the chosen course of care was so grossly incompetent "as to shock the conscience or be intolerable to fundamental fairness." *Phillips*, 14 F.4th 524, 535 (6th Cir. 2021) (citation and internal quotation marks omitted). Rather, the care Plaintiff received, despite his desire for earlier or more aggressive treatment, is not synonymous with the objective component of deliberate indifference. *See, e.g., Phillips*, 14 F.4th at 537 (holding prisoner could not establish objective component of deliberate indifference test where doctors ordered tests, identified the problem, and followed common treatment plan); *Alspaugh*, 643 F.3d at 169 (finding prisoner "was at no point denied treatment" even though continued complaints led only to minor medical interventions). Plaintiff's dissatisfaction with the treatment chosen and desire for more aggressive treatment is insufficient to establish deliberate indifference. *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976).

Plaintiff's frustration at the delay in receiving hip replacement surgery is understandable and relatable to anyone who has ever suffered a chronic, painful condition. But, quite simply, the record evidence noted above, irrespective of whether it might indicate negligence or medical malpractice, does not support a determination that Defendants acted with deliberate indifference to Plaintiff's medical needs. Accordingly, there are no genuine issues of material fact to suggest

Defendants were deliberate indifferent to Plaintiff's medical for medical treatment, and Defendants are therefore entitled to summary judgment.[8]

### 3. Defendant Lynndy Byrge

Out of an abundance of caution, the Court otherwise addresses Plaintiff's claims against Defendant Lynndy Byrge. Plaintiff maintains that a jury could find that Defendant Byrge was responsible for his lack of treatment because, as Health Services Administrator, she was responsible for coordinating treatment, and her acquiescence to Dr. Lane's dismissal of Plaintiff's serious medical need for hip joint reconstruction surgery is the proximate cause of Plaintiff's suffering [Doc. 183 p. 2-3, 7-8].

However, the competent evidence before the Court is that Defendant Byrge was not authorized to approve or deny any medical requests or medical treatment by physicians, was not responsible for Plaintiff's medical care, and could not alter or amend any treatment plan entered by the treating providers [Doc. 154-1 ¶¶ 3-5, 65-70]. *See, e.g., Mitchell v. Hininger*, 553 F. App'x 602, 608 (6th Cir. 2014) (finding claims against facility's health services administrator failed as a matter of law because she did not have the authority to authorize an appointment with a doctor or other medical professional outside of the prison). Defendant Byrge cannot be held liable for a claim of deliberate indifference based on vicarious liability. *Savoie v. Martin*, 673 F.3d 488, 494 (6th Cir. 2012). Accordingly, Defendant Byrge is otherwise entitled to summary judgment because the Plaintiff has failed to prove there is a genuine issue of material fact that she knew there

---

[8] Defendants argue an entitlement to summary judgment on a number of grounds, including Plaintiff's alleged failure to properly exhaust his grievances as to Defendants and comply with the applicable statute of limitations [*See* Docs. 152-153; 155-56]. The Court need not resolve those issues, however, as this case may be resolved on Plaintiff's failure to support his claim of deliberate indifference.

was substantial risk to the Plaintiff that she then disregarded. *Santiago v. Ringle*, 734 F.3d 585, 591 (6th Cir. 2013) (quoting *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001)).

### 4. Centurion

Just as with Defendant Byrge, Plaintiff fails to sustain a claim against Centurion. Defendants have presented proof that surgical procedures are reviewed and approved by Centurion's utilization management, and that even upon approval, it can be a lengthy process to obtain specialty consults for TDOC inmates [Doc. 157-1 ¶ 6].

Further, the competent evidence demonstrates that Centurion follows TDOC policies and was at all times in compliance with its contractual obligations [*Id*. at ¶¶ 4, 5]. There is no evidence before the Court that Centurion made a deliberate choice to follow a course of action in an effort to establish a formal policy of depriving Plaintiff or other inmates of any constitutional rights or denying care to inmates in order to save costs [*Id*. at ¶¶ 10, 11]. While Plaintiff speculates that Centurion delayed his eventual hip replacement surgery through a custom of removing in-network providers [Doc. 182 p. 6], Plaintiff does not support this conclusory accusation with any evidence from which a reasonable jury could find that a custom or policy of Defendant Centurion caused any violation of his constitutional rights. Accordingly, Plaintiff has failed to produce sufficient evidence that he suffered any injury because of Centurion's policy or custom of inmate medical care, and Centurion is entitled to judgment as a matter of law as to all claims brought against it.

## III. MOTION TO DISMISS

Defendant Kenneth Williams has filed a motion for the dismissal of all claims asserted against him in the Amended Complaint pursuant to Rule 12(b)(1) and (6) of the Federal Rules of Civil Procedure [Doc. 159].

To survive a motion to dismiss, a complaint must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim for relief is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A claim for relief is implausible on its face when "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." *Id.* at 679. When considering a plaintiff's claims, all factual allegations in the complaint must be taken as true. *See, e.g.*, *Erickson v. Pardus*, 551 U.S. 89, 93-94 (2007). However, the Supreme Court has cautioned:

> Determining whether a complaint states a plausible claim for relief will. . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged - but it has not "show[n]" - "that the pleader is entitled to relief." Fed. Rule Civ. Proc. 8(a)(2).

*Iqbal*, 556 U.S. at 679 (internal citations omitted).

Additionally, while Plaintiff's claim survived a frivolity review upon initial screening under the Prison Litigation Reform Act ("PLRA"), the standard for a Rule 12(b)(6) motion is a higher bar than the frivolity standard in 28 U.S.C. § 1915. *See, e.g, Leach v. Corr. Corp. of Am.*, No. 3:16-CV-2876, 2017 WL 35861, at *3 (M.D. Tenn. Jan. 4, 2017) (stating the required screening of a plaintiff's complaint under the PLRA is "a lower burden for the plaintiff to overcome in order for his claims to proceed" than a motion to dismiss under Rule 12(b)(6)). It is with these standards in mind that the Court considers the Defendant's motion.

Plaintiff names Defendant Williams in the style of his Amended Complaint and identifies him as the "TDOC Medical Director" [Doc. 15 ¶ 5]. The only other mention of Defendant Williams in the body of the Amended Complaint is as follows:

20

> Defendant Dr. Kenneth Williams T.D.O.C. Medical Director as the final medical authority for clinical services under terms of TDOC/Centurion Contract acted with deliberate indifference in his individual and official capacities to serious medical needs to which plaintiff was entitled under Contractual Scope of Services A.2.b.1.2.3 resulting in plaintiff suffering in violation of the Eight[h] Amendment and 42 U.S.C. Sect. 1983."

[*Id*. at ¶ 53].

In response to Defendant Williams' motion to dismiss, Plaintiff maintains that as TDOC Medical Director, Williams is, per the contract between TDOC and Centurion, "the final medical authority for clinical services" including outside medical services [Doc. 180 p. 5-6]. Therefore, Plaintiff maintains, it is Defendant Williams' obligation to ensure that medical services are constitutionally adequate [*Id*.].

However, Plaintiff cannot rely on a theory of respondeat superior based on Williams' status as "Medical Director." A supervisor is not liable under § 1983 on any theory of liability unless the supervisor encouraged the specific incident or in some way directly participated in it. *Hays v. Jefferson County, Ky*., 668 F.2d 869, 874 (6th Cir. 1982). At a minimum, a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the alleged unconstitutional conduct. *Id*.

Here, Plaintiff has pointed to no factual development regarding if, how, and when Defendant Williams learned of Plaintiff's condition, what authority Williams had to remedy the situation or ensure access to specialized treatment, and whether Williams subjectively understood the severity of Plaintiff's condition. Therefore, there are no allegations in the complaint to suggest that Defendant Williams authorized, approved, or knowingly acquiesced in any alleged unconstitutional conduct. Accordingly, all claims against Defendant Williams will be dismissed.

## IV.    DR. CHESTER[9]

Defendant Dr. Chester has not appeared in this action.  Defendant Dr. Chester was personally served with process on August 17, 2021 [Doc. 91].  After Defendant Chester failed to timely respond to Plaintiff's complaint, this Court entered an Order requiring Plaintiff "to show good cause as to why this matter should not be dismissed as to Defendant Chester for Plaintiff's failure to request entry of default" against her [Doc. 123 p. 2].  Plaintiff replied to the Court's Order [Doc. 126] and filed a "Motion for Default Judgment" [Doc. 127].  On May 13, 2022, the Court entered an Order denying Plaintiff's motion for default judgment without prejudice as procedurally improper and advising Plaintiff that he must first move for a Clerk's entry of default [Doc. 131].

On June 7, 2022, Plaintiff filed a motion to alter or amend the Court's Order denying his motion for default judgment against Dr. Chester [Doc. 136].  By Order entered June 13, 2022, the Court denied Plaintiff's motion for reconsideration, and it noted that Plaintiff could have "simply remed[ied] his error by filing the proper request with the Clerk" [Doc. 137 p. 3].  Plaintiff did not thereafter file a request for entry of default with the Clerk.

Accordingly, the Court finds that Plaintiff has been given multiple opportunities and specific instructions with regard to prosecuting this action against Dr. Chester, and Plaintiff has failed to prosecute this action against that Defendant.  Accordingly, Defendant Chester will be dismissed.[10]

---

[9] Dr. Kenneth Williams filed an affidavit in which he states that Defendant Chester is not a physician, but rather was the Deputy Director of Clinical Services, who last worked at DSNF on August 29, 2019 [*See* Doc. 180-1 p. 10].

[10] The Court otherwise finds Defendant Chester would be entitled to dismissal from this action, as Plaintiff has failed to demonstrate deliberate indifference with regard to the allegations of his Amended Complaint, as set forth above.

22

## V.      CONCLUSION

For the reasons set forth above, Defendants Byrge and Centurion's motions for summary judgment [Docs. 152 and 155] will be **GRANTED**.  Defendant Williams' motion to dismiss [Doc. 159] will also be **GRANTED**.  Defendant Chester will be **DISMISSED** due to Plaintiff's failure to prosecute.  This action will be fully and finally **DISMISSED**.

**AN APPROPRIATE JUDGMENT ORDER WILL ENTER.**

ENTER:

_____
s/ Leon Jordan
United States District Judge